*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re GALVAN, Minors.

UNPUBLISHED
October 13, 2022

No. 358615
Wayne Circuit Court
Family Division
LC No. 2019-001748-NA

Before: SWARTZLE, P.J., and CAVANAGH and REDFORD, JJ.

PER CURIAM.

Respondent-father[1] appeals as of right the trial court's order terminating his parental rights to the minor children, EG and SG, under MCL 712A.19b(3)(b)(*i*) (parent's act caused sexual abuse and there is a reasonable likelihood of abuse in the future), (c)(*i*) (conditions that led to adjudication continue to exist and will not be rectified within a reasonable time), (c)(*ii*) (other conditions exist that have not been rectified), (g) (parent failed to provide proper care and custody), (j) (reasonable likelihood of harm if child is returned to parent's home), and (k)(*ii*) (parent abused the child, the abuse included criminal sexual conduct involving penetration, and there is a reasonable likelihood that the child would be harmed in the parent's care).[2] We affirm.

On September 25, 2019, a petition was filed by the Department of Health and Human Services (DHHS) for temporary custody of RG, EG, and SG, asserting that it was contrary to the welfare of the children to remain in the care and custody of respondent because of neglect, abandonment, substance abuse, and improper supervision. The petition stated that Child Protective Services (CPS) received a complaint on August 28, 2019, alleging improper supervision of RG and EG after both children were taken to Children's Hospital under the influence of Xanax. And when respondent arrived to the hospital, he was obviously under the influence but refused a drug screen. It was determined that respondent had an extensive CPS history dating back to 1997

---

[1] When these proceedings began, the children's mother was deceased; she died in 2013.

[2] A third child, RG, was also at issue in these proceedings but she turned 18 years old by the time the termination proceedings concluded, and thus, was not named in the final order. See MCL 722.52(1) (18 is the age of majority in Michigan).

(involving a son), an extensive criminal history dating back to 1986 (involving over 10 separate incidents), and an extensive substance abuse history. Respondent admitted that he did not have suitable housing for his children and that he was homeless. The children had been living with respondent's aunt and uncle, and respondent had not been providing any financial support for his children despite receiving survivor benefits on behalf of the children and food stamps.

A preliminary hearing was held on September 25, 2019, and the petition was authorized. Respondent had appeared for the hearing from jail. The CPS petitioner, Danielle King, testified at the hearing that the children were living with respondent's aunt and uncle. King testified that two of the children, RG and EG, were taken to Children's Hospital under the influence of Xanax and respondent also appeared to be under the influence when he arrived at the hospital but refused a drug test. King testified that respondent had prior services offered to him which were to address parenting and substance abuse but respondent did not benefit from those services. King was requesting supervised visitation for respondent if the court authorized the petition. She was also requesting trauma screening and counseling for all three children, as well as documentation to allow them to attend schools in the area where their grandparents live in Detroit. The children would be living with their grandparents, where they had lived before, and with their half-brother. King testified that there was nothing short of bringing this case to court that would keep these children safe. The court held that it was clearly contrary to the welfare of the children to remain in their home and the children were made temporary wards.

An amended petition, dated October 30, 2019, was filed which indicated that RG and EG participated in forensic interviews at Kids-Talk and both disclosed that they knew respondent had a history of abusing drugs, including heroin, and had seen respondent overdose on drugs. EG admitted that she was with respondent one time when he purchased cocaine and she knew that respondent was homeless. The petition also stated that respondent had an extensive criminal history, including six convictions, five of which were felony convictions.

On December 3, 2019, a bench trial on the amended petition seeking temporary custody of the children was conducted. The DHHS admitted the following exhibits: certified copy of respondent's convictions; certified copies of his drug screens from September 4 and 20, 2019; and guardianship records. The CPS petitioner, Danielle King, testified at the hearing that respondent had previously attempted to set up a guardianship for the children after the Children's Hospital incident but he was unsuccessful. Respondent told her that he was homeless. Respondent told King that SG had been staying with his brother and sister-in-law since about September of 2018 and he was not providing any care or support for her. Respondent was in arrears on his child support at least $20,000 he told King. Respondent told King that he was previously addicted to Vicodin but he had not used substances in many years and did not ever overdose. King testified that this family had an extensive CPS history with at least 17 contacts and at least three were substantiated for respondent's substance abuse. Respondent had previously been provided referrals for substance abuse treatment but King was unaware if he completed treatment. King testified that respondent's substance abuse impaired his ability to care for these children. King also testified that the children had lived with other relatives over the years, including their maternal grandparents and their step-sister. At the conclusion of King's testimony, statements were made in support of the court taking temporary jurisdiction of the children, including that on September

20, 2019, respondent tested positive for hydrocodone and benzoylecgonine[3] so it appeared that respondent continued to use drugs. Further, respondent did not have suitable housing and the children had not been in his care for a long time.

Thereafter, the trial court concluded that the evidence was sufficient for the court to exercise jurisdiction and the children were made temporary wards of the court and the agency was ordered to complete a parent-agency treatment plan. DHHS had a parent-agency treatment plan already prepared and it was admitted as an exhibit. The plan provided for respondent to obtain and maintain employment and suitable housing, participate and benefit from substance abuse services, as well as participate in random drug screens and drug counseling therapy. The plan further provided for respondent to take a psychological evaluation and follow the recommendations, in addition to attending all scheduled parenting times, completing parenting classes, attending court dates, and maintaining contact with DHHS.

On June 24, 2020, a dispositional review and permanency planning hearing was conducted. Counsel for petitioner indicated that the conditions that brought the children into care had not been rectified. SG and EG were placed with their maternal uncle, while RG was placed with her 19-year-old sister. There were concerns with RG's placement as she had been AWOL a few times and was pregnant, expecting a child in December of 2020. Respondent was terminated from the substance abuse program because of an inability to locate him. He was also ordered to comply with drug screening and only submitted to one on January 30, 2020, which was positive for Xanax and cocaine. Respondent failed to keep two appointments for a psychological examination and was terminated by the service provider. Respondent also did not demonstrate appropriate parenting skills and demonstrated an inconsistency with the visitations. Arrangements were made for him to have parenting time closer to his home but he missed all scheduled visits. Respondent only attended 2 of 14 parenting classes and he was terminated from the program twice due to absences. His income and housing remained uncertain. He also was inconsistent with communication with the foster care service workers and CPS. Respondent was deemed to be "in complete non-compliance with everything in his Parent-Agency Treatment Plan." The court ordered a re-referral for all of the services and that respondent essentially start the parent-agency treatment plan all over. The court found that the permanency plan was a concurrent plan for reunification and guardianship for SG and EG with their uncle and his spouse. The permanency plan for RG was changed to APPLA, i.e., Another Planned Permanent Living Arrangement which is a stable living arrangement that includes relationships with significant adults in the child's life. RG was ordered to complete a trauma assessment and to participate in a maternal infant health program.

On November 13, 2020, a dispositional review and permanency planning hearing was conducted. The foster care worker, Porsha Smith, testified on behalf of petitioner and indicated that the conditions that brought the children into care had not been rectified. Respondent had not made any progress and was not in compliance with the parent-agency treatment plan. Smith

---

[3] Benzoylecgonine is a compound excreted by the human body following consumption of cocaine. See Hamilton, H.E., *Cocaine and Benzoylecgonine excretion in humans*. (J. Forensic Science, October 1977). <http://www.pubmed.ncbi.nlm.nih.gov (accessed September 29, 2022).

testified that she had re-referred respondent to numerous services and he had been early terminated several times, one as recently as November 9. Further, respondent had not completed any drug screens and when Smith completed a manual drug screen on October 16, respondent tested positive for cocaine. Smith had also been unable to verify suitable housing or a legal source of income. Despite a parenting time schedule, respondent had only visited the children twice. And he had not been involved in their educational needs, although the school required his participation and his signature on certain documents. Further, respondent had been incarcerated on felony-firearm charges for most of July and was facing a two-and-a-half-year sentence to which he had to report in January 2021. SG and EG were still placed with their maternal uncle, while RG was still with her adult sister. The court noted that respondent had been re-referred for all services and that the permanency plan remained the same for the three children.

On April 12, 2021, a dispositional review and permanency planning hearing was conducted. The foster care worker, Porsha Smith, testified that an additional CPS complaint was made during the reporting period that would result in a supplemental petition being filed seeking permanent custody and a termination of respondent's parental rights. At that time, respondent was incarcerated and not engaged in any services, but he also was not in compliance before he was incarcerated. Further, RG's residence changed and she was living with an aunt. The allegations in the supplemental petition, however, would not pertain to respondent's failure to comply with the parent-agency treatment plan but instead would pertain to alleged sexual abuse against one of the children by respondent.

A supplemental petition dated June 29, 2021 was filed by the DHHS seeking the termination of respondent's parental rights. The petition alleged that in March of 2021, SG disclosed that respondent made her do things to him and she could not stop thinking about the times he sexually abused her. On April 27, 2021, SG participated in a forensic interview at Kids-Talk and she disclosed sexual abuse by respondent on two separate occasions. The first incident occurred about a year before when respondent woke her up and made her put her mouth on his penis, while he said "suck my d***," as he was pushing her head down. He was "high" at the time. The second incident occurred on the day before he went to prison, January 15, 2021, when he "put it down there" and she kept saying "no, no, no," and he stopped. Respondent was "high" at that time also. The petition noted that respondent was "in total noncompliance with his treatment plan prior to his incarceration" on January 16, 2021, he was incarcerated for carrying a concealed weapon, and his earliest release date was June 23, 2023 but his maximum discharge date was December 23, 2030. The supplemental petition sought termination of respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (c)(*i*), (c)(*ii*), (g), (j), (k)(*ii*), and (k)(*ix*).

On July 14, 2021, a pretrial hearing was conducted on the supplemental petition for permanent custody, terminating respondent's parental rights, and a trial date was set.

On August 10, 2021, a bench trial began with the DHHS calling as a witness SG, who was 12 years old. SG testified that respondent "made me do stuff and touched me down there." The "down there" meant where she urinates and he touched it with his "down there area," which was what he uses to urinate. This happened this year, when she was 12 years old, at her sister's house, and his skin was touching her skin. He put his "down area in my down area." "He put his down there area by my down there area and he put it in it." Respondent touched her vagina, under her

clothes, with his penis and it lasted about "one minute because I kept telling him to stop and trying to push him away."

In addition to that time, SG testified, respondent made her "do something to him, like, two times." "He made me put my mouth on his down there area." One time it was in his truck and the next time it was at an uncle's house. His "down there area" actually went inside her mouth. With respect to the truck incident, SG thought respondent "was a little drunk, and he made me do it when I was telling him to stop, but he wouldn't." Respondent, who had his penis exposed, grabbed her head and "made me do it because I was trying to push up and he wouldn't let my head go up." His exposed penis was in her mouth. With respect to the second incident, SG was sleeping and he woke her up, "and he made me put my mouth on his down area and I yelled at him to stop when he wouldn't . . . ." "I was trying to let me head up, but he wouldn't let my head up." SG testified: "The first time, he did it, I thought, like, because he was just on drugs, like, maybe he won't do it again, but then the second time he did it, I was, like, I didn't want to be around him anymore because I'm scared of him now." When asked why she thought respondent was on drugs the first time, she replied, "Because he usually is on drugs." "My dad was always on drugs." SG said that the drugs are heroin and crack. When asked if she would want to live with respondent if he was not incarcerated SG said, "No, I do not want to live with him." SG explained that she did not tell anyone about these incidents until respondent went to jail because she was "scared if he figured out I told someone, like, he would hit me or something." SG testified that she did not want to have a relationship with respondent.

The next witness called by DHHS was Kenyetta Thomas, the CPS Maltreatment in Care Investigator in this case. She was assigned the case because of allegations of sexual abuse by respondent of SG. Through her investigation she determined that respondent might similarly abuse or neglect his other children, and thus, termination of his parental rights was sought. She discussed the sexual abuse allegations with SG in March of 2021 and foster care worker, Porsha Smith, was also present. SG said that respondent touched her in a sexual manner and she did not want to think about it anymore. Thomas then scheduled a Kids-Talk interview for SG. Thomas referenced two sexual abuse incidents in the termination petition but learned of the third incident from SG's testimony during this bench trial. Thomas relied on the Kids-Talk disclosure to prepare the termination petition.

The next witness called by DHHS was the foster care worker, Porsha Smith. She was assigned this case in September 2019 and respondent went to prison on January 16, 2021. There was a parent-agency treatment plan in place throughout the pendency of this case. The main issues for respondent to work on were substance abuse issues and parenting skills. Contrary to his treatment plan, respondent basically did not get substance abuse counseling and only did one random drug screen. He also was ordered to complete a psychological assessment and failed to comply despite being referred four times. Respondent also did not have a legal source of income or suitable housing. He only attended possibly two parenting class sessions. Thus, since December of 2019, Smith testified, respondent had not completed any part of his parent-agency treatment plan and had not benefitted from the services provided. Smith did not learn about the sexual abuse allegations until March of 2021, when SG's sister and uncle told Smith what SG had disclosed to them. Smith had monthly contact with the children and, of the three children, SG was the closest to respondent. SG had openly expressed her love for her father and her desire to return home during the pendency of this case and before the sexual abuse. Smith agreed that, since the sexual

abuse, SG had been pretty devastated emotionally; respondent not only violated her body, but her trust. After this testimony, DHHS requested the court to take judicial notice of the case file and rested its case.

Respondent then testified and he denied touching SG inappropriately. He denied forcing SG to put his penis in her mouth and denied putting his penis in her vagina. Respondent testified that he loves his children and visited them. He admitted he was not in compliance with his parent-agency treatment plan before he went to prison, but he did go to a couple of parenting classes. He denied sexually abusing SG, saying, "that's a lie." On cross-examination, respondent denied doing any illegal drugs and only took drugs that were prescribed to him by a doctor. He was prescribed Xanax and Vicodin and he had no issues with remembering things. Respondent denied having any prior criminal history other than carrying a concealed weapon for which he was in prison. Respondent denied being addicted to heroin and crack cocaine in the past. He admitted to drinking but did not drink in excess. When asked why SG would "make up" allegations of sexual abuse he said that he did not know why.

Following closing statements, the trial court summarized the evidence and rendered its decision. The court noted: the three separate incidents of sexual assaults against SG and the court found SG to be credible; the fact that respondent had from September 2019 until he went to prison in January of 2021 but did not even minimally participate in, or even start to complete, his parent-agency treatment plan; and that respondent—who the court found not to be credible—"forgot" that he tested positive for illegal drugs during these proceedings and simply just denied everything. The court concluded that the material allegations in the supplemental petition were substantiated by clear and convincing evidence and terminated respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (c)(*i*), (c)(*ii*), (g), (j), and (k)(*ii*). In particular, the court found under MCL 712A.19b(3)(b)(*i*) that respondent sexually assaulted SG; under (c)(*i*) that respondent had over a year to rectify the conditions that led to the adjudication but did not do so and there was no reasonable likelihood that the conditions would be rectified within a reasonable time; under (c)(*ii*) that other conditions existed—the three incidents of sexual assault against SG—and there was no reasonable likelihood that conditions would be rectified within a reasonable time; under (g) and (j) that respondent failed to provide proper care and custody, there was no reasonable expectation he would be able to do so within a reasonable time and that, based on his sexually abusive conduct, there was a likelihood that the children would be harmed if returned to his care; and under (k)(*ii*) that respondent sexually assaulted SG involving penetration on three separate occasions. Because the court found statutory grounds for termination, a hearing on the issue of the children's best interests followed.

The DHHS then re-called as a witness the foster care worker, Porsha Smith. Smith testified that it was in the best interests of SG to have respondent's parental rights terminated because he sexually assaulted her and a continued relationship with him would not be beneficial to her. It was also in the bests interests of EG and RG because there was a likelihood that such assaults could happen to them and, considering respondent's failure to complete the parent-agency treatment plan, there was no likelihood that respondent would be able to provide stability, safety, or permanency for these similarly-situated children in the near future. The long-term plan for SG and EG would be for them to be adopted by their maternal aunt and uncle who were willing to adopt them and with whom they had lived successfully in a safe and stable place for quite some time. Because RG was an adult, she would continue in her then-current living arrangement with

her aunt where she was in a safe and stable environment. Smith had spoken with SG and EG and they had no objection to the court terminating respondent's parental rights; in fact, they had no interest in having any relationship with him. The children had been temporary court wards for almost two years. And still respondent was not in a position to provide any type of permanency, stability, or safety for these children.

During cross-examination of Smith, the court indicated that RG had turned 18 years old within the previous couple of weeks, and thus, she would be removed from the supplemental petition for the termination of respondent's parental rights in her regard. RG could decide for herself if she wanted a relationship or contact with respondent.

Thereafter, respondent testified that he loved his children, would like to continue his relationship with them, and would be able to provide for them once he was out of prison.

Following closing statements, the trial court summarized the evidence and rendered its decision. The court noted that guardianships are not permanent, can be easily terminated, and do not prevent access and contact. The court was convinced that the children would be at risk of future abuse or neglect from respondent. Recognizing that the court has a duty to determine the best interests of each child individually, the court also noted that it could look at how a parent treats one child to determine how that parent may treat another child. And here, SG was sexually assaulted by respondent. The court held that respondent's parental rights to SG should not remain intact in light of that conduct, but also that his rights with respect to EG should be terminated because she was at risk of abuse and/or neglect by respondent as well. The court recognized that placement with relatives weighs against termination and must be considered but in this case the court found that termination of respondent's parental rights was still in the best interests of both SG and EG. The court concluded that the children needed permanence and stability and respondent was unable to provide for these children at that time or in the near future. Accordingly, respondent's parental rights were terminated and both children were made permanent wards by the court. Thereafter, an order was entered consistent with the court's ruling. This appeal followed.

Respondent argues that the trial court erred by finding there were statutory grounds to terminate his parental rights. We disagree.

This Court reviews for clear error a trial court's finding whether a statutory ground for termination has been proven by clear and convincing evidence. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). A finding is clearly erroneous when we are left with a definite and firm conviction that a mistake was made. *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). "In applying the clear error standard in parental termination cases, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Schadler*, 315 Mich App 406, 408-409; 890 NW2d 676 (2016) (quotation marks and citation omitted).

A trial court must terminate a parent's parental rights if it finds that a statutory ground under MCL 712A.19b(3) has been established by clear and convincing evidence and that termination is in the child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The trial court terminated respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (c)(*i*), (c)(*ii*), (g), (j), and (k)(*ii*), which provide:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

\* \* \*

(b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

\* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . .

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

(*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

\* \* \*

(k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

* * *

(*ii*) Criminal sexual conduct involving penetration, attempted penetration, or assault with intent to penetrate.

If this Court concludes that the trial court did not clearly err by finding one statutory ground for terminating respondent's parental rights, this Court does not need to address the additional statutory grounds in support of termination. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Respondent first argues on appeal that termination was improper because he "was willing to complete a treatment plan and did not sexually abuse his daughter." This argument is unavailing.

Termination of parental rights is proper under MCL 712A.19b(3)(c)(*i*) when "the totality of the evidence amply supports that [the parent] had not accomplished any meaningful change in the conditions" that led to the court taking jurisdiction over the minor, *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009), and "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age," MCL 712A.19b(3)(c)(*i*). In this case, respondent—who had an extensive CPS history dating back to 1997 and thus was familiar with child protective proceedings—was provided a parent-agency treatment plan in December 2019. He was ordered to obtain and maintain employment and suitable housing, as well as to participate in and benefit from parenting classes, substance abuse services that included drug screens and drug counseling, and undergo a psychological evaluation and follow related recommendations. Respondent was also required to attend all scheduled parenting times and court dates, and to maintain contact with DHHS. Despite extensive services being offered to respondent from December 2019 to the time he went to prison in January 2021, respondent was in complete non-compliance with the parent-agency treatment plan—meaning he basically did almost nothing. And not only did respondent fail to work toward reunification with his children, he also failed to provide any financial support for them despite receiving money and food stamps as survivor benefits for the children's loss of their mother. That respondent was purportedly "willing to complete a treatment plan" while he was in prison is of little to no consequence under the circumstances of this case. The trial court did not clearly err in finding by clear and convincing evidence that the conditions that led to the adjudication continued to exist and there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering the children's ages.

Respondent also challenges the grounds for termination that were based on his sexual assaults against SG, denying that he sexually assaulted SG. Those grounds for termination included MCL 712A.19b(3)(b)(*i*), (c)(*ii*), (g), (j), and (k)(*ii*). The trial court specifically found that there was clear and convincing evidence that respondent sexually assaulted SG on three separate occasions involving penetration and based on his conduct there was a reasonable likelihood that both SG and EG would be harmed if returned to respondent's care. The trial court did not err in finding that termination was justified under these grounds. SG testified at length about respondent's sexual assaults—three incidents involving penetration—and the trial court found her testimony credible. We afford due deference to the trial court's judgment of the credibility of the witnesses who appeared before it. See *In re Schadler*, 315 Mich App at 408-409. Moreover, we

-9-

agree with the trial court's determination that respondent—who denied having any prior criminal history, using illegal drugs, and committing the sexual assaults—was not credible. Because respondent sexually assaulted SG, he did not provide proper care of her or EG under MCL 712A.19b(3)(g) and there was no reasonable expectation that he would in the future. Respondent also exposed SG to physical and emotional harm under MCL 712A.19b(3)(j) and there was a reasonable likelihood that both SG and EG would be harmed if returned to his care. Given the evidence, the trial court properly terminated respondent's parental rights under MCL 712A.19b(3)(b)(*i*), (c)(*ii*), (g), (j), and (k)(*ii*).

And although not challenged by respondent on appeal, we conclude that the trial court also did not err in its best-interest determination under MCL 712A.19b(5). "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App at 90. This Court reviews for clear error the trial court's determination of best interests. *Olive/Metts*, 297 Mich App at 40.

When determining whether termination is in the best interests of the child, the trial court's focus is on the child, not the parent. *In re Schadler*, 315 Mich App at 411. "[T]he court may consider the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality . . . ." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). The trial court may also consider other facts, such as "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). In addition, the trial court may consider the parent's substance abuse problems. *In re AH*, 245 Mich App 77, 89; 627 NW2d 33 (2001).

In this case, the trial court properly considered that SG was sexually assaulted by respondent. The court noted that both SG and EG would be at risk of future abuse and neglect from respondent and that adoption, rather than guardianships, would be the best way to protect them from future unwanted access and contact with respondent. The court also recognized that both SG and EG needed permanency, stability, and finality which they would have with the caregivers who had consistently provided a safe and loving home for them. The trial court did not clearly err in its best-interest determination.

Affirmed.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ James Robert Redford